**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| RODNEY L. WARING, Personal Representative for the Estate of Raudnesia Jachirri Waring, | ) ) ) | **Civil Action No.:  2:23-cv-5453-RMG** |
| PLAINTIFF, | ) ) ) | |
| vs. | ) ) | |
| JEREMY S. KRAFT, Individually and as Agent of City of North Charleston  and North Charleston Police Department, JORDAN G. WILLIAMSON, Individually and as Agent of City of North Charleston and North Charleston Police Department, REGGIE BURGESS, Individually and as Agent of City of North Charleston and North Charleston Police Department, R. KEITH SUMMEY, Individually and as Agent of City of North Charleston and North Charleston Police Department, CITY OF NORTH CHARLESTON and NORTH CHARLESTON POLICE DEPARTMENT, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **COMPLAINT** Jury Trial Demanded |
| DEFENDANTS. | ) ) | |

NOW COMES the Plaintiff, as Personal Representative for the Estate of Raudnesia Jachirri Waring, for this Complaint and alleges as follows:

### PARTIES

1.     Plaintiff Rodney L. Waring is sui juris, natural father and the duly appointed Personal Representative of the Estate of his natural daughter, decedent, Raudnesia Jachirri Waring (hereinafter "Raudnesia") by Order of the Probate Court of Charleston County.

2.      Defendant Jeremy S. Kraft (hereinafter "Kraft") is sui juris, and was at all times relevant, a citizen and resident of the State of South Carolina, who was acting under color of law and within the course and scope of his employment and agency as a Police Officer with the North Charleston Police Department. Kraft is also sued in his individual capacity.

3.      Defendant Jordan G. Williamson (hereinafter "Williamson") is sui juris, and was at all times relevant, a citizen and resident of the State of South Carolina, who was acting under color of law and within the course and scope of his employment and agency as a Police Officer with the North Charleston Police Department. Williamson is also sued in his individual capacity.

4.      Defendant Reggie Burgess (hereinafter "Burgess") is sui juris, and was at all times relevant, a citizen and resident of the State of South Carolina, who was acting under color of law and within the course and scope of his employment and agency as the then Police Chief with the North Charleston Police Department. Burgess is also sued in his individual capacity.

5.      Defendant R. Keith Summey (hereinafter "Summey") is sui juris, and was at all times relevant, a citizen and resident of the State of South Carolina, who was acting under color of law and within the course and scope of his employment and agency as the Mayor and Chief Administrative Officer of the City of North Charleston Police Department. Summey is also sued in his individual capacity.

6.      Defendant North Charleston Police Department ("NCPD") is a governmental entity organized and existing pursuant to the laws of the State of South Carolina and is located within the City of North Charleston and acted by and through its agents / employees, and Officers, including, but not limited to, Defendant Kraft, Defendant Williamson and its then primary and final policymaker Chief Reggie Burgess ("Chief Burgess").

7.     Defendant City of North Charleston ("North Charleston") is a governmental agency/entity existing under the laws of the State of South Carolina and located in the City of North Charleston, Charleston County, South Carolina which at all times acted by and through its agents, servants, and/or employees including, but not limited to:

a)     Its primary policy makers North Charleston City Council and the Mayor/City Administrator as City Council serves as a link between City government and the citizens, neighborhoods and agencies located within the City of North Charleston which is situated within the counties of Charleston, Berkeley and Dorchester, and also represents the citizens concerns and interests. City of North Charleston and its Council also budget for, purchases, owns, maintains, insures, entrusts and furnishes the patrol vehicles and equipment ("City Vehicles") used by NCPD and its Officers, (including the City Vehicle used by Officer Kraft), as well as budgets for and provides funding for the entirety of the operations of the NCPD, (roughly $39 million for 2022-2023) that includes, as employees of the City, all Officer training and salaries, for the benefit and public safety of the citizens of the City of North Charleston; and

b)     The call takers, law dispatchers, law enforcement dispatchers, supervisors, and its Director, as the primary policymaker of the City of North Charleston and Consolidated 911 Center aka Consolidated Dispatch Center ("Dispatch"), who are all employees within that agency/department of the City of North Charleston, and were acting within the course as well as scope of their employment and agency;

8.     This Court has subject matter jurisdiction over all claims alleged and personal jurisdiction over the parties.

9.     Plaintiff brings this survival, wrongful death and civil rights actions on behalf of the decedent and her heirs and statutory beneficiaries pursuant to S.C. Code Ann. § 15-51-90, § 15-5-10, 42 U.S.C. § 1983 and 42 U.S.C. § 1988 as well as the common law of South Carolina.

10.     Venue is proper in that a substantial part of the acts and omissions alleged herein occurred in the City of North Charleston, Charleston County, South Carolina.

## ACTS & OCCURRENCES

11.     Each and every act of negligence, gross negligence, recklessness, and/or willful and wanton conduct by any one or more of the Defendants, and their incorporation into the causes of action set forth infra, constitute multiple acts and/or occurrences as may be determined by a jury, under applicable South Carolina law and/or statutes, including § 15-18-10 et seq., 42 U.S.C. § 1983 and 42 U.S.C. § 1988 as well as the common law of South Carolina.    Each and every act herein incurred by Raudnesia Waring occurred on or about July 5, 2022 in The City of North Charleston in the County of Charleston along Dorchester Road, a major causeway of private, commercial and pedestrian travel in The City of North Charleston.

## FACTUAL ALLEGATIONS

## A. OFFICER DRIVING DATA

12.     The City, by and through its Dispatch, captures and records, depending on the City Vehicle, the exact speed, heading, and location of the driving of every on-duty Officer in every City Vehicle, including as to any Incident that a Officer is responding to (hereinafter "Officer Driving Data").

13.     Officers also can receive turn-by-turn driving directions in their City Vehicles from Dispatch that provides the safest and most direct route for the Officers to follow when responding to Incidents.

14.     Officer Driving Data is archived, such that every minute of Officer driving can be easily retrieved, reviewed, and audited at any time.

a.     Per NCPD policy, driving by Officers of their City Vehicles is further captured on dash camera video, ("Dash Cam Video") that captures and records the City Vehicle's speed, use of emergency lights and audible sirens, and other data points, and can be triggered automatically or manually by an Officer and/or an Officer's actions.

15.     All Dash Cam Video is also archived by NCPD and is readily accessible and reviewable by NCPD.

16.     The existence of all of this Officer Driving Data, that includes, at times, Dash Cam Video, (collectively "Officer Driving Data") means that every act of dangerous and/or unlawful Officer driving behavior, including those Officers engaged in reckless and unlawful speeding, is at all times captured, known, and easily reviewable by NCPD, and/or Chief Burgess.

## B. THE PATTERN OF CONDUCT AND LACK OF TRAINING OF OFFICER KRAFT

17.     Officer Kraft was hired by the City of North Charleston and North Charleston Police Department and started as a Community Service Officer (CSO) on October 26, 2015.  This was his first position with law enforcement.  On August 29, 2016 Officer Kraft was promoted to Community Service Officer II (CSOII).  He began CSOII Field Training on September 14, 2016. He graduated from the SC Criminal Justice Academy on November 18, 2016 with a class 2LCO Basic Certification, and completed the final phase of his CSOII training on November 26, 2016. On January 20, 2017 Officer Kraft was issued and allowed to take home a City Vehicle. On August 14, 2017 Officer Kraft was promoted to Patrol Officer (PO).  As a Patrol Officer, on or about November 2018 Kraft applied for a position with the Mobile Field Force Team.   In

December of 2019 he became a member of the Traffic Unit and in May of 2022 became a member of the Power Shift Unit.

18.    As was extensively documented and publicly reported, Officer Kraft's records, including but not limited to, training records, certificates, vehicle pursuit reports, vehicle accident reports, performance evaluations, and other documents and events, showed numerous instances where Officer Kraft: (1) struggled tremendously with geography and navigation, including an inability to know locations/zones as well as  not being clear and to the point as to situations/instructions; and (2) operated his City Vehicle in a dangerously unsafe manner without due regard for others.

19.    Specifically, from January 20, 2017, when Officer Kraft was issued a City Vehicle, through July 5, 2022, Officer Kraft was involved in eight (8) accidents (OIC Officer Involved Collision), six (6) wherein he was found at fault for failure to drive with due regard, traveling too fast for conditions, and violating traffic laws.  For his six (6) at fault accidents he was issued four (4) Letters of Instruction, one (1) Letter of Reprimand and was finally terminated for his last accident of July 5, 2022, which resulted in the death of Raudnesia Waring.

20.    In addition to the officer involved collisions, Officer Kraft's records also contain seven (7) formal complaints.  Officer Kraft received three (3) complaints in violation of vehicle pursuits and operations, two (2) complaints of inhumane treatment, one (1) complaint of unnecessary force (hard) and one (1) complaint of conduct toward the community regarding allegations of "Road Rage".  Six (6) of the complaints were sustained.  Officer Kraft received a suspension of 1 day/8 hours and Letters of Instruction for his violations of Vehicle Pursuits and Operations for failing to follow traffic laws, failing to clear the intersection and tailgating at 80 MPH because traffic was moving too slow for Officer Kraft.  He was verbally counseled and received a Letter of Reprimand for his violations of inhumane treatment for failing to seatbelt subjects and for

dragging an unresponsive subject by restraints from a holding facility to a transport van where the unresponsive subject was left on the floor of the van while being transported to the detention center. Officer Kraft also received a Letter of Reprimand in violation of use of force when he used unnecessary force (hard) and punched a subject in the head.

21.     Further, during Kraft's employment with NCPD from March 10, 2017 through June 27, 2022 there are approximately eleven (11) cases which document Officer Kraft's conduct with regard to Vehicle Pursuits and Operations. Eight (8) of these cases occurred between January 21, 2021 through June 27, 2022 and the remaining three (3) cases occurred between March 10, 2017 and February 13, 2019. While there was no formal action taken against Kraft regarding these cases, these cases were reviewed and Officer Kraft was counseled regarding same. The majority of these cases document Kraft's vehicle speeds at 80MPH, 81MPH, 100MPH, 113MPH and 137MPH. It is further documented throughout these cases that Officer Kraft failed to activate his body worn camera (BWC) and misjudged distance for a turn wherein he ended up on the wrong side of the road. Officer Kraft was verbally counseled by superiors and advised to be more proactive, to remain professional even in high stress situations. His superiors also addressed concerns regarding Kraft's speed and overdriving of his vehicle.   In many of these cases both Officer Kraft and Officer Williamson were involved and both verbally counseled and advised that using more caution would be beneficial and encouraged both to weigh the infraction versus pursuits due to department liability and officer/community safety.

22.     Upon information and in accordance with Officer Kraft's NCPD training records, Officer Kraft only underwent a total of two (2) hours of driving training and ten (10) hours of EVO (Emergency Vehicle Operation) annual training throughout his entire six (6) years of employment with NCPD.

23.     In accordance with NCPD policy and/or custom, Officer Kraft never received adequate training or remedial training of any kind and the City of North Charleston and NCPD continued to reward Officer Kraft's actions and violations by providing him pay increases.

C. **OFFICERS ARE NOT AUTHORIZED TO SPEED UNLESS IT IS AN EMERGENCY**

24.     NCPD Officers regularly and routinely receive calls for service from Charleston County Consolidated   Dispatch ("Dispatch") who receives 911 calls from the public.

25.     On July 5, 2022 the "Emergency Call" or "Shots Fired" call which Officer Kraft claims he was responding to before his collision, was not an "Emergency Call" or  a true. "Shots Fired" call.  The original dispatched call was for medical care, specifically, EMS, to aid a person who was bleeding from the mouth.  The caller advised dispatch that he was calling for his brother who was bleeding from the mouth.  The caller confirmed to dispatch that his brother was alert, that his injury was non-traumatic, that he did not have any bleeding disorder, and he did not know what happened.  The dispatcher remains on the phone with the victim's brother.  After approximately 4 minutes into the call the victim advises the brother that he was shot in the mouth.  The caller/brother advises dispatch that his brother said he had been shot earlier that day and requested EMS again.  The dispatcher then asked if the suspects were in the area to which the caller replied no and that it happened earlier and requested again that EMS be sent.  The dispatcher then changed the original medical EMS call   from hemorrhage/bleeding/laceration to a GSW/Stab/PenTrauma call and advised EMS to stage the scene.  Dispatch then assigned Officers to the call.  Officer Williamson was assigned to respond to the call.  Officer Kraft was not assigned but took the lead to the call and did not radio in his positioning as leading vehicle.

26.    A Non-Emergency call  mandates the Officer to respond and follow Non-Emergency Vehicle  Operations per South Carolina law and NCPD Policy, that requires the responding Officer to:

      a.      Respond via the most direct route; and

      b.      Obey all traffic laws.

27.    Officers also receive turn-by-turn driving directions in their City Vehicles from Dispatch, providing the safest and most direct route for the Officers to follow to respond.

28.    Officers know they must at all times obey all traffic laws unless they are specifically granted the legal  privilege to disregard them as set forth in South Carolina law.

29.    Further, Officers also know that if, and only if, they are so authorized to exceed the posted safe speed limits and disregard other traffic laws, the use of due regard and emergency lights and audible sirens to warn others is mandatory.

### D. THE UNLAWFUL VEHICLE OPERATIONS OF WILLIAMSON & KRAFT

30.    At approximately 5:00 p.m. on July 5, 2022, Officers Kraft and Williamson were working in the City of North Charleston, Charleston County, in uniform, and driving City Vehicles owned by the City of North Charleston City and furnished to NCPD.

31.    At that time, Officers Kraft and Williamson were enroute to a traffic stop call traveling East on Dorchester Road.

32.    At approximately 5:05(53 sec) p.m., on said date, Officer Williamson was one (1) of ten (10) officers assigned to respond to the scene to stage for EMS to assist the victim who had been shot in the mouth earlier that day. Once again, Officer Kraft was not assigned to this call but responded anyway.

33.    Officer Williamson and Kraft knew they were legally required to obey all traffic laws in responding.

34.    Officer Kraft's and Williamson' Driving Data from each of their City Vehicles, shows the exact time, vehicle speed, latitude, and longitude of their entire route of travel from the beginning of this call until The Crash.

35.    Officer Williamson and Officer Kraft both, nearly at the same time, made a U-turn on Dorchester Road in order to respond to a call to stage for EMS, even though Officer Kraft was not assigned.  Kraft took the lead in the response.

36.    Per the Officer Driving Data, dash cam video, etc. both Officers Kraft and Williamson greatly exceeded the posted speed limit and operated their City Vehicles without due regard at a time of day and on a highway known to be heavily congested with traffic.

37.    Per the data, this unlawful, unauthorized, and life-threatening speeding was facilitated by both Officers Kraft and Williamson until Officer Kraft's City Vehicle impacted the unsuspecting driver, namely, Raudnesia Waring.

38.    Per the Data,  Officer Kraft reached shocking speeds, maneuvered his vehicle into on-coming traffic while Officer Williamson, trying to catch up, had already reached speeds in excess of 70 miles per hour on a road with a posted speed of 40 MPH.

39.    Per the video Data, a separate NCPD Officer assigned to the "Shots Fired" call, is seen traveling South on Montague Avenue and continuing straight, thus crossing the intersection of Montague Avenue and Dorchester Road in front of Officer Kraft.  At this intersection Officer Kraft could have and should have followed his fellow officer and made a left turn onto Montague Avenue and avoided said congested traffic, but instead continued through the intersection and traveled straight up Dorchester Road.

40.    Per the data, Officer Kraft had reached 83 MPH when he ran the red light and struck Raudnesia Waring's vehicle, which resulted in her death.

### E.  DEVIATIONS, DELIBERATE INDIFFERENCE, & DEATH

41.    Prior to and at the time of the Crash on July 5, 2022, both Officers Kraft and Williamson had completed South Carolina Criminal Justice Academy training.

42.    As a result of that training, both Officer Kraft and Williamson knew or should have known:

a.    Officers spend more time behind the wheel than any other place;

b.    As Officers spend more time behind the wheel than in any other place, it is imperative that an officer possess driving skills that are superior to those of the general motoring public;

c.    "Excessive speeds are seldom, if ever, warranted since the Officer has, as their first duty, to get to the scene before they can be of any assistance"; and

d.    When authorized, the use of emergency lights and audible signal when traveling over the posted speed limit is mandatory.

43.    Accordingly, Officers Kraft and Williamson knew the extreme dangers and lethality a City Vehicle posed to people on the roads.

44.    In addition, based upon their experience, including personally witnessing and investigating high-speed car collisions, issuing citations, and enforcing traffic laws as part of their duties as Officers, both Kraft and Williamson personally knew the incredible and often fatal dangers reckless speeding and the disregard of traffic control signals posed to the public at large.

45.    With all of this actual, subjective knowledge, Officer Kraft deviated from the safest route to reach the injured person. He did so with a deliberate indifference to the safety of everyone on the road, reaching speeds of up to 83 mph, and never once obeyed the speed limit.

46.    Officer Kraft knew, and had every reason to know, accelerating along the way to 83 mph, (43 mph over the limit) that he was violating both South Carolina law and NCPD Policy.

47.    Officer Kraft could have and should have followed other NCPD Officers and taken a safer route with less traffic.  Officer Kraft had access to his own cell phone (Google Maps / Waze, etc) and/or Garmin device in his City Vehicle.

48.    At approximately 5:06 p.m. at a speed of approximately 82 mph Defendant Kraft ran the red light, without slowing and violently slammed into the vehicle driven by Raudnesia Waring.

49.    Immediately prior to and at the moment of The Crash, Raudnesia was driving her vehicle lawfully.

50.    Raudnesia was not at fault and in no way contributed to the cause of The Crash.

51.    Following the impact, Raudnesia's vehicle was launched westward, began to rotate in a counter-clockwise direction across the eastbound lanes, traveled over a curb on the eastbound side across a sidewalk and over a small patch of grass where it entered the parking lot of 5101 Dorchester Road, then continued to rotate in a counter-clockwise direction in the parking lot of 5101 Dorchester Road and began to travel in an easterly direction to its position of final rest. Upon its position of final rest where the parking lot of 5101 Dorchester Road intersects with Bon Aire Boulevard; the vehicle was left facing a northeasterly direction.

52.    Officer Kraft's City vehicle traveled in a westerly direction to its position of final rest on the westerly side of the intersection; the vehicle was facing a southwesterly direction.

53.    Raudnesia sustained catastrophic injuries as a result of The Crash, suffered conscious pain and suffering, and subsequently died at the scene before EMS could transport her to the hospital.

## F. SCHP & NCPD POST-CRASH INVESTIGATIONS

54.    South Carolina Highway Patrol ("SCHP") investigated the cause of The Crash and determined The Crash was caused solely by the unlawful driving of Officer Kraft.

55.    SCHP also determined that Raudnesia was not at fault and in no way contributed to the cause of The Crash.

56.    NCPD also investigated the cause of The Crash and determined The Crash was caused solely by the unlawful driving of Officer Kraft.

57.    Neither the SCHP nor NCPD noted, commented, or inquired as part of their investigations as to the timing and the speed of Defendant Kraft in responding to an EMS call and was not assigned nor dispatched to said call.

58.    Neither the SCHP nor NCPD noted, commented, or investigated the obvious fact that the two Officers have a pattern of conduct of dangerous speeding and vehicle operations.

59.    Both Officer Kraft and Williamson, by their acts and omissions, knowingly, recklessly, and needlessly put the lives of all the people on the road that day at grave risk, including Raudnesia Waring, all in violation of South Carolina law.

## G. NCPD's HISTORY OF DANGEROUS OFFICER DRIVING, CRASHES, AND VIOLATIONS OF 14TH AMENDMENT RIGHTS

60.    The North Charleston Police Department has a long and infamous history of dangerous and reckless driving by its Officers that often involves the unlawful misuse and destruction of City Vehicles, that threatens public safety, and has resulted in numerous, recurrent violations of the 14th Amendment rights of those they injure and/or kill.

61.     NCPD Officers have a history of  using City Vehicles and repeatedly causing vehicle crashes, especially those causing serious injury, death and/or  property damages to its citizens. Herein, are some of the instances in the past decade, of known incidents, based upon information and belief:

a.     On 1/27/2010, a NCPD Officer was involved in a collision that resulted in injuries to a minor passenger. Lawsuit alleges that the Officer made an illegal U-turn without emergency lights or sirens;

b.     On 11/13/2012 a NCPD Officer was engaged in a high speed pursuit and collided with a motorcyclist causing serious injury;

c.     On 12/28/2012, a NCPD Officer collided with a bicyclist  causing serious injury to a passenger as a result of the Officer's reckless due regard

d.     On 3/25/2017, a NCPD Officer caused a collision with injuries during a high speed pursuit;

e.     On 4/18/2017, a NCPD Officer failed to pay attention to the flow of traffic, and without the use of a turn signal, crossed a double yellow line and made an illegal U-turn resulting in a collision with injuries;

f.     On 10/26/2018, NCPD and other LE agencies ended pursuit after a 1 hour and 40 minute high speed chase from North Charleston to Summerville which resulted in a collision with injuries;

g.     On 1/31/2019, NCPD pursuit of a suspect in stolen vehicle resulted in a high speed chase which resulted in a collision, injuries and fire;

     h.      On 4/19/2020, a NCPD Officer operating his vehicle in an unsafe manner without light and sirens made an illegal U-turn causing a collision with injuries involving a Charleston County Sheriff's Deputy;

     i.      On 8/10/2019, NCPD pursuit of a suspect ends in collision with injuries on Dorchester Rd.;

     j.      On 09/23/2019, NCPD pursued a vehicle down McMillan Avenue wherein the driver of the pursued vehicle lost control and hit another vehicle;

     k.      On 3/21/2022, NCPD Officer hits a pedestrian on Dorchester Road and leaves the scene;

     l.      On 5/7/2022, NCPD attempted a traffic stop for a speeding vehicle which ensued into a high speed chase where speeds reached 116 MPH. This pursuit resulted in the suspect colliding and crashing into another vehicle.

     m.      On 05/10/2022, Defendant Kraft (while working off duty) pursued a vehicle which resulted in that car colliding with a parked vehicle;

     n.      On 7/1/2022, NCPD police chase of underage driver results in two (2) fatalities;

     o.      On 7/5/2022, a NCPD Officer operating in an unsafe manner, failed to clear intersection, ran red light resulting in a collision and fatality;

     p.      On 10/18/2023, NCPD traffic stop resulted in  high speed pursuit from Azalea Drive down I-26 West to Highway 78 resulting in a collision at an apartment complex.

62.     Defendants City of North Charleston and NCPD certainly knew and know of each of these instances and every other incident involving City Vehicles furnished and entrusted to NCPD and its Officers, as all claims related to damage to City Vehicles are handled through the City of North Charleston Risk Management Office, as well as many of these collisions have resulted in litigation.

63.     More importantly, as the above listing of crashes shows, Defendants City of North Charleston and NCPD had actual knowledge that their policies, customs, actions, and inactions were causing injuries, death, and violations of citizens' 14th Amendment rights of bodily integrity. City of North Charleston and NCPD possessed Officer Driving Data to prove and establish each one of the aforementioned incidents including every minute of dangerous driving and/or unlawful misuse of City vehicles that resulted in these collisions.

**H. CITY OF NORTH CHARLESTON & NCPD POLICIES, CUSTOMS, AND NEGLIGENT  TRAINING, SUPERVISION, AND DISCIPLINE OF OFFICERS**

64.     As the training records  show, NCPD had and has customs and/or policies for Officers while in field training.  Officer Kraft  received grades for normal driving and emergency driving wherein he was never rated for emergency driving and received on the average a 3/5 for normal driving.   Officer Kraft didn't receive any further or ongoing monitoring, follow-up, or remedial training of any kind, regardless of any concerns and/or issues raised.

65.     Despite the numerous counseling by the City of North Charleston and NCPD, Officer Kraft never received any specific training or retraining.

66.     As set forth above, the existence of all Officer Driving Data, that includes, at times, Dash Cam Video, meant that every act of dangerous driving and/or unlawful misuse of City Vehicles by Officers, including those Officers engaged in reckless and unlawful speeding, was at all times

captured, known, and easily reviewable by the City, NCPD and/or their respective policymakers. This repository of knowledge includes specific instructions regarding reckless driving and unlawful speeding by NCPD Officers.

67.    Both the City of North Charleston and NCPD had reviewed both Officers Kraft and Williamson's Driving Data to prevent, monitor, identify, retrain, and/or discipline the Officers for dangerous driving and/or unlawful misuse of City Vehicles.  The City and NCPD leadership were fully aware of the repeated actions and failed to prevent and deter same.

68.    Contrary to the City of North Charleston and NCPD policy and custom, even when an Officer was involved in a collision and their driving was subject to review, many Officers were not disciplined for blatant violations of NCPD policy and/or State Law and instead, routinely received "Letters of Instruction" or verbal counseling.

69.    As a result of the City of North Charleston and NCPD practices and custom, Officers knew and know that so long as they were not involved in a collision, and many times, even if they were, their dangerous driving and/or unlawful misuse of City Vehicles, even if proven in their Officer Driving Data, would never be reviewed and/or likely be the subject of any discipline. This created an unwritten policy and culture to support dangerous driving.

### J. CONDONATION

70.    As set forth above, there exists in both the NCPD and the City of North Charleston a tacit and express acceptance of dangerous driving and unlawful misuse of City Vehicles by Officers despite knowledge that dangerous and unlawful Officer Driving of City Vehicles has caused and is causing collisions and recurring violations of the 14th Amendment rights of those who are the victims of their driving.

71.     Direct proof of NCPD's express condonation of unlawful behavior is shown throughout both Officer Kraft's and Officer Williamson's driving records wherein it's heavily documented that both Officers were repeatedly counseled regarding their speed, failure to obey traffic laws, and failure to operate City vehicles with due regard (Vehicle Pursuit and Operations).

72.     Further proof of condonation are NCPD's suggestive comments to both Williamson and Kraft to weigh the infraction versus pursuit. In other words, ***"do whatever as long as you get your suspect and make an arrest"***. Defendant NCPD's condonation of this unlawful behavior shows how supervisors at NCPD view instances of dangerous, unlawful driving, even when captured on video.

73.     Despite this extensive history and knowledge of dangerous Officer driving, set forth above, there has been a complete absence of any review of any Officer Driving Data; any meaningful monitoring, supervision, disciplining, reporting, re-training and/or investigation of Officers and their dangerous driving and/or unlawful misuse of City Vehicles by either NCPD and/or the City of North Charleston so as to ratify and condone their behavior despite knowing that said Officers are causing injuries and death to its citizens and violations of citizens' 14th Amendment rights of bodily integrity.

74.     The policies, customs, and negligent training, supervision, and discipline by the City of North Charleston & NCPD of Officers as of July 5, 2022, set forth *supra* and *infra*, created a culture of dangerous driving and unlawful misuse of City Vehicles by Officers as Officers knew that there was (a) an absence of supervision; (b) an absence of any discipline or consequences; and (c) tacit and/or express approval and acceptance of any and all of their dangerous driving and/or unlawful misuse of City Vehicles, and as such, made it likely and foreseeable to NCPD and/or City of North Charleston and their policymakers that people on the road with Officers

would suffer injuries, death, and 14th Amendment rights violations from the ongoing and future dangerous driving and/or unlawful misuse of City Vehicles by NCPD Officers, including Raudnesia.

75.    As a direct and proximate result of any one or more of the acts and/or omissions of any one or more of the Defendants as alleged herein, Raudnesia suffered catastrophic injuries with conscious pain and suffering that ultimately resulted in her death.

**<u>FOR A FIRST CAUSE OF ACTION</u>**
**(Negligence/ Negligence Per Se)**

76.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

77.    Defendant Kraft was negligent, careless, reckless, grossly negligent and wanton, and proximately caused The Crash, the injuries, and the death of Raudnesia Waring in any one or more of the following respects:

a)    Exceeded the posted speed limits, disregarded traffic signals, and endangered life and property in violation of S.C. Code Ann. §56-5-760 *Operation of authorized emergency vehicles*;

b)    Violated numerous traffic laws as set forth in S.C. Code Ann.  §§ 56-5-10 et seq;

c)    Failed to operate his vehicle in a lawful manner with due care for public safety;

d)    Failed to maintain control of his vehicle;

e)    Failed to keep a proper lookout while operating his vehicle;

f)    Failed to follow the law and NCPD policy;

g)    Failed to exercise the degree of care that a reasonable prudent person would have exercised under the same or similar circumstances; and

h)    In such other and further particulars as the evidence and/or trial may show.

78.    Defendant NCPD is vicariously liable for the negligent, careless, reckless, grossly negligent, and wanton acts and omissions of Defendant Kraft.

79.    Defendant City of North Charleston, by and through the acts and omissions of its employees, was negligent, careless, reckless, grossly negligent and wanton acts and is liable for the injuries and death of Raudnesia Waring in any one or more of the following respects:

    a)    Failed to exercise reasonable care in the communication of complete and accurate information to responding Officers;

    b)  Failed to exercise reasonable care to monitor, supervise, create and enforce policies, as well as investigate the use of its funds and equipment and property used by the NCPD and its Officers given the extensive history of crashes involving City Vehicles by the NCPD Officers and the data captured by Dispatch related to the driving of each and every OFFICER, that is known to exist by NCPD and the City of North Charleston and is readily and easily accessible to same;

    c)  Failed to exercise the degree of care that a reasonable person would have exercised under the same or similar circumstances; and

    d)  In such other and further particulars as the evidence and/or trial may show.

80.    Defendant City of North Charleston is vicariously liable for the negligent, grossly negligent, and reckless conduct of the relevant and responsible employees as alleged herein.

81.    As a direct and proximate result of any one or more of the acts and/or omissions of any one or more of the Defendants as alleged herein, Raudnesia Waring suffered catastrophic injuries with conscious pain and suffering that ultimately resulted in her death.

## FOR A SECOND CAUSE OF ACTION
### (Negligent Hiring and Retention of Kraft and Williamson)

82.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

83.     NORTH CHARLESTON and NCPD owed a duty to hire, train, and retain Officers to ensure that those Officers did not create an unreasonable risk of harm to the public at large with their driving of City Vehicles, given the vast amount of time Officers spend behind the wheel; and the extreme dangers and lethality a City Vehicle poses to people on the roads.

84.     NORTH CHARLESTON and NCPD knew, or reasonably should have known, at the time of hiring, that Defendant Kraft did not have the proper disposition and/or temperament to safely operate a City Vehicle given his driving history prior to and during his employment.

85.     Based upon Defendant Kraft's prior driving history, and OFFICER Driving Data after he was hired, NCPD knew or should have known that hiring and retaining him as a law enforcement officer presented a danger to the public at large, and it was foreseeable that he would fail to operate his City Vehicle in a reasonable manner consistent with South Carolina law and law enforcement policies, especially as he had never previously worked as a law enforcement officer.

86.     NORTH CHARLESTON and NCPD knew, or reasonably should have known, at the time of hiring, that Defendant Williamson did not have the proper disposition and/or temperament to work as a law enforcement officer as indicated by litigation in which he was a named Defendant with his previous employer , Berkeley County Sheriff's Department for excessive force.

87.     Based upon Defendant Williamson's OFFICER Driving Data after he was hired, NCPD knew or should have known that retaining him as a law enforcement officer presented a danger to the public at large, and it was foreseeable that he would fail to operate his City Vehicle in a reasonable manner consistent with South Carolina law and law enforcement policies. Additionally, Defendant Williamsons' behavior continued with excessive force claims, further supporting his propensity from the time of hiring for this outrageous behavior as outlined in litigation filed against him while employed with North Charleston Police Department.

88.     As a direct and proximate result of any one or more of the acts and/or omissions of any one or more of the Defendants as alleged herein, Raudnesia Waring suffered catastrophic injuries with conscious pain and suffering that ultimately resulted in her death.

## FOR A THIRD CAUSE OF ACTION
### (Negligent Training – NCPD of Kraft and Williamson)

89.     All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

90.     Defendants NORTH CHARLESTON and NCPD knew or should have known that its failure to provide adequate training to and supervision of the Officers of the NCPD, including Defendants Kraft and Williamson, would and could result in serious injury and/or death.

91.     Defendants NORTH CHARLESTON and NCPD breached their duties by their policies, customs, and failure to reasonably train Officers Kraft and Williamson, as set forth supra, who committed the acts and omissions described in this Complaint.

92.     As a direct and proximate result of any one or more of the acts and/or omissions of any one or more of the Defendants as alleged herein, Raudnesia Waring suffered catastrophic injuries with conscious pain and suffering that ultimately resulted in her death.

## FOR A FOURTH CAUSE OF ACTION
### (Negligent Supervision by NCPD of Kraft and Williamson)

93.     All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

94.     Defendants NORTH CHARLESTON and NCPD owed a duty to exercise reasonable care to monitor, supervise, create, and enforce policies, as well as investigate the dangerous, wrongful, and/or unlawful conduct of its Officers operating City Vehicles, including Officers Kraft and Williamson, to determine if these persons were safe and appropriate drivers on the road, especially given the vast amount of time spent driving as well as the lethality of a City Vehicle.

95.    Specifically, as to Defendant Kraft, NCPD owed a duty to monitor and supervise his driving behavior with even greater scrutiny as he had never worked previously as a law enforcement officer and had a well-documented series of safety problems, other collisions and difficulties in his training, see supra, before causing The Crash.

96.    Defendant NCPD breached their duty by failing to supervise Officer Kraft who committed the acts and omissions described in this Complaint.

97.    Specifically, as to Defendant Williamson, NCPD owed a duty to monitor and supervise his behavior, including but not limited to his driving behavior, due to his previous employment as a law enforcement officer with well-documented issues regarding excessive force and safety, as well as well-documented issues regarding excessive force, vehicle pursuits and other safety issues while an officer with NCPD before the collision causing Raudnesia's death.

98.    As a direct and proximate result of any one or more of the acts and/or omissions of any one or more of the Defendants as alleged herein, Raudnesia Waring suffered catastrophic injuries with conscious pain and suffering that ultimately resulted in her death.

## FOR A FIFTH CAUSE OF ACTION
### (42 U.S.C § 1983 – Civil Rights Violation by Defendants)

99.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

100.    The acts and omissions of Defendant Kraft knowingly driving a City Vehicle in violation of South Carolina law and NCPD policy, at such extreme and outrageous speeds while responding to a non-emergency, unassigned call, constituted a conscience-shocking deliberate indifference to the lives and safety of those on the road that evening, including Raudnesia Waring.

101.    Specifically, Defendant Kraft subjectively knew and recognized the substantial risk of harm his dangerous driving of a City Vehicle that afternoon posed with full knowledge of the risks involved to the public as they:

      a.    Had adequate time from when officer Williamson was first dispatched until The Crash to regulate their conduct—to slow down, encourage each other to slow down, and apply their knowledge and training to the situation, reflect on their actions, and conform their behavior to lawful behavior;

      b.    Knew they were not responding to an active shooting;

      c.    Knew the law (and department policy) that required them to drive the speed limit and obey all traffic laws;

      d.    Continued to drive at incredibly excessive and dangerous speeds, especially Kraft's conscience-shocking 83 mph — nearly forty-three miles per hour over the 40 mph speed limit—on a very busy, high traveled roadway during a peak travel time with full knowledge of the risks of his actions.

102.    At all times material to this Complaint, and as alleged above, Defendant Kraft acted with recklessness and deliberate indifference constituting a conscious disregard to the clearly established 14th Amendment substantive due process rights of Raudnesia, including those of her heirs and statutory beneficiaries in their familial relationship with the decedent:

      a.    to be free from deliberately indifferent and conscious shocking government behavior; and

      b.    to be free of the loss of bodily integrity and property.

103.    As a direct and proximate cause of the acts and omissions as alleged *supra,* Defendant Kraft violated 42 U.S.C. § 1983, and acted with deliberate indifference constituting a conscious

disregard to the clearly established 14th Amendment rights of Raudnesia that resulted in her

catastrophic injuries resulting in her death.

## U.S.C. § 1983 MONELL LIABILITY

104.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth

herein.

105.    NCPD and its departmental policymaker Chief Burgess, along with the City of North

Charleston and its final policymaker, R. Keith Summey are City actors for the purposes of 42

U.S.C. § 1983 liability for any one or more of the following reasons:

a.    Due to the unique legal structure of the City of North Charleston, and the

NCPD the State nor any other governmental entity has any direct supervisory control over

NCPD Officers and policies relating to same, especially those as to administrative matters

such as supervision and training to include of Officer driving protocols; and

b.    Specifically, the policies promulgated by the City of North Charleston which

empowered Chief Burgess as to his supervision and training of department Officers and their

driving, especially as to responding to non-emergency law enforcement calls, is purely an

administrative matter, and is his alone as the final police department policymaker because

no other governmental entity or person had such authority on this particular issue.

106.    City of North Charleston and NCPD are thus entities capable of being sued

pursuant to 42 U.S.C. § 1983 for any one or more of the following reasons:

a.    The State of South Carolina Treasury will not and does not pay or satisfy or

is any way responsible for any judgment rendered against the City of North Charleston and

NCPD; and

b.      Every aspect of the operations of the NCPD is budgeted for, funded, and paid for by the City, including, the training, salaries, and benefits of its Officers who are classified and paid as City employees; and

c.      This funding by the City of North Charleston includes the responsibility to insure and indemnify Mayor Summey, NCPD, Chief Burgess and Officers and as such, City of North Charleston is liable for any judgment rendered against them pursuant to 42 U.S.C. § 1983.

107.    City of North Charleston is therefore liable for any judgment pursuant to 42 U.S.C. § 1983 rendered against Mayor Summey, NCPD, Chief Burgess, and/or his Officers.

108.    At all times material to this Complaint, NCPD acting by and through Chief Burgess its agents and Officers, including Defendants Kraft and Williamson, as set forth *supra*, were at all times acting under color of state law.

109.    Through the policies, customs, actions, and inactions as alleged *supra*, and the dangerous misuse of City Vehicles by Officers and documented by Driving Data and other information related to same, the City of North Charleston, its Chief Administrator, Mayor Summey, Defendant NCPD and its policymaker/manager Chief Burgess had both actual and constructive knowledge that North Charleston citizens and others on its roads had and were experiencing recurrent and numerous violations of their 14th Amendment rights by the dangerous misuse of City Vehicles by Officers pursuant to these policies, customs, actions and inactions.

110.    These policies, customs, actions, and inactions by NCPD as alleged *supra*, implicitly ratified this dangerous misuse of City Vehicles by Officers, and created a culture whereby Officers, including Defendants Kraft and Williamson, knew that there was no supervision, monitoring,

and/or accountability for the dangerous misuse of City Vehicles unless and until that driving resulted in property loss, injury, and loss of life, including 14th Amendment violations.

111.    At all times material to this Complaint, and as alleged *supra*, Defendant City of North Charleston, its Chief Administrator, Mayor Summey and NCPD, acting by and through Chief Burgess, its policymaker/manager, acted with recklessness and deliberate indifference constituting a conscious disregard to the clearly established 14th Amendment rights of Raudnesia Waring by implicitly ratifying and failing to take any actions to monitor, supervise, stop, correct, or ameliorate known and ongoing violations of clearly established 14th Amendment rights resulting from the dangerous misuse of City Vehicles by Officers that caused and resulted in the catastrophic injuries and death of Raudnesia, including those of her heirs and statutory beneficiaries in their familial relationship with the decedent.

**FOR A SIXTH CAUSE OF ACTION**
**(42 U.S.C. § 1983 – Municipal Liability Official Policy)**

112.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

113.    At all times material to this Complaint, Defendant NCPD acting by and through their Police Chief, agents, Officers and other policymakers, had official policies as alleged *supra*, of deliberate indifference constituting a conscious disregard to the clearly established 14th Amendment substantive due process rights of rights and safety of the citizens of North Charleston which is within Charleston, Berkeley and Dorchester counties and others on its public roads including Raudnesia, who came in contact with Officers engaged in the misuse of City Vehicles, and documented in the Driving Data related to same including Defendant Kraft.

114.    These policies were the moving force that caused the injury and death of Raudnesia, not only violated her clearly established 14th Amendment substantive due process rights as set forth

*supra,* but also violated the substantive due process rights of her heirs and statutory beneficiaries in their familial relationship with the decedent.

## FOR A SEVENTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – Municipal Liability Unofficial Policy/Custom)

115.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

116.    At all times material to this Complaint, Defendant NCPD acting by and through their agents and policymakers, had unofficial policies and/or customs that were so persistent so as to become standard operating procedure and/or policy, as alleged *supra*, of deliberate indifference constituting a conscious disregard to the clearly established 14th Amendment substantive due process rights and safety of the citizens of the City of North Charleston and others on its public roads including Raudnesia, who came in contact with Officers engaged in the dangerous misuse of City Vehicles, including Defendant Kraft.

117.    These unofficial policies and/or customs were the moving force that caused the catastrophic injury and death of Raudnesia not only violated their clearly established 14th Amendment substantive due process rights as set forth *supra,* but also violated the substantive due process rights of her heirs and statutory beneficiaries in their familial relationship with the decedent.

## FOR AN EIGHTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – Municipal Liability - Inadequate Training & Supervision)

118.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

119.    As alleged *supra*, Defendant NCPD inadequately trained and supervised employees and agents, including its Officers as to their use and dangerous misuse of City Vehicles.

120.    The failure to adequately train and/or supervise was done with recklessness and deliberate indifference resulting in a conscious disregard to the clearly established 14th    Amendment

substantive due process rights and safety of the citizens of City of North Charleston and others on its public roadways including Raudnesia Waring, who came in contact with Officers engaged in the dangerous misuse of City Vehicles, including Defendant Jeremy Kraft, especially as Driving Data and other information easily allowed for supervision and documentation of dangerous misuse by Officers.

121.    The failure to adequately train and/or supervise Officers and others regarding the dangerous misuse of City Vehicles by Officers, including Defendant Jeremy Kraft, was the moving force that caused the injury and death of Raudnesia and not only violated her clearly established 14th Amendment substantive due process rights as set forth *supra,* but also violated the substantive due process rights of her heirs and statutory beneficiaries in their familial relationship with the decedent.

122.    Upon Information and Belief, Defendants Kraft and Williamson were "handpicked" in the Spring/Summer of 2022 for the Special Ops Power Shift Team to saturate certain communities with high crime rates. Both Defendants Kraft and Williamson displayed poor judgment in this role early in the creation. They had shared three (3) roadway infractions within forty-five (45) days of the collision which is the subject of this action.

## FOR A NINTH CAUSE OF ACTION
### (Survival Action & Damages)

123.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

124.    As a direct and proximate result of any one or more of the acts and/or omissions of any one or more of the Defendants as set forth, supra, Raudnesia Waring suffered fear, physical pain and suffering, mental and emotional distress and anguish in the time before her death, as well as property damage, and her respective estate further incurred funeral expenses and is entitled to an

award of all damages pursuant to S.C. Code Ann. § 15-5-90 and the common law of South Carolina.

**FOR A TENTH CAUSE OF ACTION**
**(Wrongful Death Action & Damages)**

125.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

126.    As a direct and proximate result of any one or more of the acts and/or omissions of any one or more of the Defendants as set forth, supra, Raudnesia Waring suffered fear, physical pain and suffering, mental and emotional distress and anguish before she died.

127.    As a result of her death, her heirs and statutory beneficiary has lost aid, comfort, support, society and companionship, and has suffered severe and extreme emotional distress, anxiety, grief and sorrow, and pecuniary losses for which the Plaintiff is entitled to recover, on behalf of the statutory beneficiaries, damages pursuant to S.C. Code Ann.§ 15-51-10, et. seq., and the common law of South Carolina.

**FOR AN ELEVENTH CAUSE OF ACTION**
**(42 U.S.C. § 1988 – Attorney Fees)**

128.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

129.    Plaintiffs are also entitled to reasonable costs and attorney fees pursuant to 42 U.S.C. § 1988 and applicable statutes and laws.

**PUNITIVE DAMAGES**

130.    All allegations made in the preceding paragraphs are re-alleged as if fully set forth herein.

131.    Plaintiffs are further entitled to punitive damages for the grossly negligent, wanton and/or reckless acts and/or omissions of any one or more of the Defendants as alleged herein.

**WHEREFORE**, Plaintiff prays for judgment against the Defendants, for all damages each may be lawfully entitled to, as may be determined and awarded by a jury against each Defendant, jointly and severally, and for such other and further relief as may be deemed appropriate by the jury and this Court, including actual and punitive damages, attorney fees and costs.

Respectfully Submitted,
**ATTORNEYS FOR PLAINTIFF RODNEY WARING, PERSONAL REPRESENTATIVE ESTATE  OF RAUDNESIA WARING**

**SPANN WILDER LAW, LLC**
By:*s/ Tiffany R. Spann-Wilder*
Tiffany R. Spann-Wilder, Esquire Federal Bar No. 07259
2131 Dorchester Road
PO Box 70488
North Charleston, South Carolina 29415
(843)266-7792(telephone)/(843) 266-7797 (fax)
tiffany@spannwilderlaw.com

**LAW OFFICE OF CLIFFORD BUSH, III, LLC**
By: *s/ Clifford Bush, III*
Clifford Bush, III, Esquire Federal Bar No.: 7747
28 Old Jericho Road
Beaufort, South Carolina 29906
(843)379-9500 (telephone)/(843)379-9550 (fax)
cbush@lawofficeofcbushiii.com

North Charleston, South Carolina
October 27, 2023